In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1163

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES BEY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 107-4 — **Charles R. Norgle**, *Judge.*

SUBMITTED MARCH 19, 2014 — DECIDED APRIL 10, 2014

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* James Bey and three others con-
spired to rob the Waukegan, Illinois, branch of Associated
Bank. They chose that location because one of the four, La-
toya Thompson, worked there and as an insider could make
a unique contribution to the crime. Bey gave David Schoen-
haar, Jr. (another coconspirator) a pellet gun for use in the
robbery and waited in a nearby getaway car with the final
coconspirator, Trevor Gregory, while Schoenhaar entered

the bank, displayed the gun, and demanded money from the vault. Thompson and a (coerced) coworker retrieved some $221,000 from the vault and gave the money to Schoenhaar, who led the two to a bathroom while pointing the gun at them and saying he'd kill them if they left the bathroom. He then left the bank—only to discover that Bey and Gregory had gotten cold feet and fled. All four conspirators were apprehended, and charged with bank robbery and with conspiracy to commit that offense. 18 U.S.C. §§ 371, 2113(a).

In the district court Bey, the only defendant before us in this appeal, entered an "*Alford* plea" on each charge. That's a plea of guilty by a defendant who maintains his innocence, but, perhaps thinking that if he goes to trial he'll be found guilty (and not be able to get the judgment overturned on appeal), because there's a mountain of evidence against him, pleads guilty in hopes of obtaining a lighter sentence. As explained in *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), "while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime. Nor can we perceive any material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt."

The district judge gave the defendant concurrent sen-

tences of 92 months for the robbery and 60 months for the conspiracy—so effectively a 92-month sentence. Because the defendant doesn't want to withdraw his guilty plea, the appeal challenges only the sentence. His lawyer advises us that he can find no nonfrivolous ground for appealing from the judgment, and so asks us to let him withdraw from representing the defendant, in accordance with the procedure authorized by *Anders v. California*, 386 U.S. 738, 744 (1967). The defendant disagrees that he has no nonfrivolous ground for appealing.

We note parenthetically that the terms "frivolous" and "nonfrivolous" are misleading in this context. Most claims or arguments held to be "frivolous" are not silly or laughable, as the word implies, but simply so clearly blocked by statute, regulation, binding or unquestioned precedent, or some other authoritative source of law that they can be rejected summarily.

And since we're discussing word usage, we take the opportunity to question another bit of legal jargon. In innumerable cases in which a criminal defendant's lawyer files an *Anders* brief our court states, usually as a prelude to granting the lawyer's motion to withdraw and dismissing the appeal, that as long as the lawyer's brief is "facially adequate" we'll confine analysis to the issues discussed in the brief and in the defendant's response (if any) to it. See, e.g., *United States v. Vallar*, 635 F.3d 271, 289 (7th Cir. 2011); *United States v. Maeder*, 326 F.3d 892, 893 (7th Cir. 2003) (per curiam). By "facially adequate" we mean that the brief appears to be a competent effort to determine whether the defendant has any grounds for appealing. That appearance reassures us that the issues discussed in the brief are the only serious

candidates for appellate review and so the only ones we need consider. We should say this rather than recite a formula—"facially adequate"—unlikely to be intelligible to the prisoner to whom the *Anders* order is addressed; with his lawyer having been allowed to withdraw, the prisoner may have difficulty understanding the what and why of the order. We should say for example: "Counsel has submitted a brief that explains the nature of the case and addresses the issues that a case of this kind might be expected to involve. Because the analysis in the brief appears to be thorough, we limit our review to the subjects that counsel has discussed, plus any additional issues that the defendant, disagreeing with counsel, believes have merit." See *United States v. Wagner*, 103 F.3d 551, 553 (7th Cir. 1996).

Turning at last to the merits, we begin with the strongest-seeming objection the defendant could make to his sentence for robbery (the sentence that determined the overall length of his prison term)—that he wasn't one of the robbers. He neither entered the bank nor even participated in the getaway; he may have sped away from the bank before the robbery was under way. And as he wasn't one of the robbers, why should he have been sentenced for robbery of the bank as well as for conspiring to rob it? The answer is that he admits having conspired to commit the bank robbery, and as a conspirator he is liable under the doctrine of *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), for crimes committed by his co-conspirators in furtherance of the conspiracy, and so for the robbery. Besides, the indictment to which he pleaded guilty had also charged him with aiding and abetting the robbery—an independent ground for the government's charging him as a principal. 18 U.S.C. § 2113(a).

The other objections that might be made to the sentence but that Bey's lawyer thinks could not possibly persuade us involve the judge's calculation of the guidelines sentencing range. The judge determined Bey's total offense level to be 31 and his criminal history category to be IV, yielding a guidelines range of 151 to 188 months (making the sentence that the judge imposed fall far below the bottom of the range). The range was for the conspiracy and robbery charges together, because they were grouped for purposes of calculating the range, as required by U.S.S.G. § 3D1.2(b), which requires grouping when the "counts [of which the defendant was convicted] involve[d] the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."

Among the other factors that generated Bey's high offense level were that Schoenhaar had brandished (displayed) a dangerous weapon, U.S.S.G. § 2B3.1(b)(2)(E), and had physically restrained coconspirator Thompson's innocent coworker. § 2B3.1(b)(4)(B). These factors added five levels to Bey's offense level. In addition, rejecting the probation service's recommendation for a 2-level reduction for the defendant's accepting responsibility for his crimes, § 3E1.1(a), the judge instead added two offense levels for obstruction of justice, § 3C1.1, on the basis of evidence that the defendant had urged a potential witness to ignore a subpoena served by the government to testify at the trial. The judge gave Bey two additional two-level enhancements, one for conspiring to rob a "financial institution," U.S.S.G. § 2B3.1(b)(1), the other for the amount of money taken in the robbery. § 2B3.1(b)(7)(c). And he refused to give the defendant a 2-level reduction in his offense level as a minor participant in the conspiracy.

§ 3B1.2(b).

We note regarding the increases in total offense level for physically restraining the bank employee and brandishing a "dangerous weapon" that the "weapon" needn't be lethal as long as it "closely resembles" a lethal weapon, U.S.S.G. §§ 1B1.1, Application Note 1(D); 2B3.1(b)(2)(E); *United States v. Hart*, 226 F.3d 602, 607 (7th Cir. 2000); *United States v. Allen*, 516 F.3d 364, 375–76 (6th Cir. 2008)—which pellet guns often do (see the photo below), especially ones used in a robbery, where they would lose most of their efficacy if they were recognized as mere airguns.



Not that pellet guns are harmless unless aimed at small rodents. People have been killed by them. See, e.g., Star-Ledger Editorial Board, "Pellet Guns Are Weapons Too," Jan. 9, 2009, http://blog.nj.com/njv_editorial_page/2009/01/ pellet_guns_are_weapons_too.html (visited April 10, 2014). Bank tellers have good reason to fear them.

In opposing the increase in his offense level for physically restraining the bank employee, Bey argues that he never anticipated that Schoenhaar would brandish the gun or physically restrain anyone. He says he thought that given Thompson's participation the robbery would be an inside job and not perturb the bank's customers or employees. But he knew that Schoenhaar had taken the gun into the bank— he'd given it to him for that purpose. And he had to know that since the robbery would be committed while the bank was still open for business, employees and customers would be present and Schoenhaar might well use the gun to herd them to somewhere in the bank in which they could neither interfere with the robbery nor escape. He pointed the gun at Thompson's coworker (who was not an accomplice in the robbery, unlike Thompson), herded her into the bathroom, and threatened to kill her if she left it. See *United States v. Taylor*, 620 F.3d 812, 813, 815 (7th Cir. 2010); *United States v. Carter*, 410 F.3d 942, 954 (7th Cir. 2005). Such a use of the gun was foreseeable to the defendant, making him culpable. *United States v. Dorsey*, 209 F.3d 965, 967–98 (7th Cir. 2000).

As for whether his encouraging a potential witness (his girlfriend) to ignore a trial subpoena was an obstruction of justice, he argues that he told her to ignore it only because he thought the government had dropped the charges against him. He presented no evidence in support of this implausi-

ble claim—not even an affidavit (which would have been some evidence). Furthermore, the subpoena had not been quashed, so he had to know that he was telling her to violate a court order. So the finding of obstruction of justice stands, and it greatly undermines his claim to be entitled to a sentencing discount for acceptance of responsibility.

Not that an increase in offense level for obstruction of justice can never coexist with an acceptance of responsibility discount. U.S.S.G. § 3E1.1, comment 4, says that "conduct resulting in an enhancement … ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 [obstruction of justice] and 3E1.1 [acceptance of responsibility] may apply." But there has to be evidence of contrition, see, e.g., *United States v. Mayberry*, 272 F.3d 945, 947, 949–50 (7th Cir. 2001); *United States v. Salazar-Samaniega*, 361 F.3d 1271, 1278–80 (10th Cir. 2004), and not just a plea of guilty, which is often, perhaps typically, opportunistic. The defendant expects a lighter sentence if he pleads guilty than if he's convicted after a trial, and so if he doesn't anticipate acquittal (and certainly Bey could not have anticipated being acquitted had he chosen to be tried) he might as well plead guilty, whether or not he "accepts responsibility" in any meaningful sense for having committed the crime.

And finally Bey has no plausible claim for a minor-participant reduction in his guidelines range. He insists that he is less culpable than Thompson (who worked at the bank and assisted in the robbery), Schoenhaar (the principal executor of the robbery), and Gregory (Thompson's boyfriend and the driver of the getaway car). Actually he's as culpable

as Schoenhaar and more culpable than the others: he re-cruited Schoenhaar to execute the robbery and supplied him with the pellet gun that Schoenhaar used in the robbery. See, e.g, *United States v. McKee*, 389 F.3d 697, 700 (7th Cir. 2004); *United States v. Nichols*, 151 F.3d 850, 854 (8th Cir. 1998); *United States v. Lowery*, 60 F.3d 1199, 1201–02 (6th Cir. 1995).

Given the defendant's age (62) and poor health, a sentence of 92 months—almost eight years—is admittedly stiff. But it is so far below the bottom of the guidelines range that it cannot be thought excessive. We are pleased to see that the district judge sentenced the defendant as far below the guidelines range as he did in order to avoid imposing a sentence that in the circumstances would be "a sentence of life," citing a recent opinion of this court expressing concern about sentences so long that they are likely to crowd the prisons with the elderly. *United States v. Craig*, 703 F.3d 1001, 1002–04 (2012) (per curiam) (concurring opinion); see also *United States v. Johnson*, 685 F.3d 660, 661–62 (7th Cir. 2012).

The motion of the defendant's lawyer to withdraw is granted and the appeal dismissed.