In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 16-4083 & 17-1402

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE MALDONADO AND FRANCISCO
MASIAS,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 1068 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED APRIL 4, 2018 — DECIDED JUNE 21, 2018

Before WOOD, *Chief Judge,* and BAUER and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* Jose Maldonado and Francisco Masias (together, "the Defendants") were charged with conspiring to distribute cocaine, amongst six other counts irrelevant to this appeal. During trial, the district court gave a multiple conspira-

cies jury instruction and refused to give a "meeting of the minds" instruction proposed by Masias. The jury convicted the Defendants on all counts, and they now appeal. They contend the government lacked sufficient evidence to prove conspiracy between them and Edwin Rodriguez, a cooperating defendant, and Masias contends separately that the district court erred by refusing to give a "meeting of the minds" jury instruction.

## I.  BACKGROUND

On December 16, 2010, a grand jury returned a seven-count indictment charging the Defendants with conspiracy to possess more than five kilograms of cocaine, in violation of 21 U.S.C. § 846; possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); using the telephone to facilitate a narcotics offense, in violation of 21 U.S.C. § 843(b); and unlawful possession of firearms by a felon, in violation of 18 U.S.C. § 922(g)(1).

At trial, Rodriguez testified that beginning in spring 2009, he and Maldonado spent a considerable amount of time together. Maldonado taught him how to "rerock" cocaine, a process for diluting cocaine with additives to make it into a larger quantity for resale. This process allows a seller to turn a single kilogram of cocaine into as many as three kilograms. The two of them rerocked cocaine together several times with Maldonado fronting a portion of the drugs to Rodriguez for resale. (Fronting occurs when a seller supplies cocaine to a buyer on credit with an understanding the buyer will pay for the cocaine from further sales.) Maldonado stored cocaine and firearms at Rodriguez's residence, and on several occasions, Rodriguez accompanied Maldonado while he delivered

cocaine to his customers. Rodriguez also testified that from late 2009 through early 2010, Masias was a supplier of cocaine to Maldonado, and often fronted this cocaine.

The government presented additional evidence of specific drug deals involving the Defendants, largely through surveillance and intercepted phone calls.

On January 11, 2010, the Defendants coordinated a drug deal with Teodoro Gorostieta, Masias' cousin and supplier. Gorostieta delivered the cocaine to Maldonado while Masias negotiated and coordinated the deal. After this transaction, the Defendants agreed to check the quality of the cocaine together and Maldonado agreed to buy a box of cocaine cutting agent for Masias.

On January 13 and 14, 2010, Masias borrowed Maldonado's Cadillac, which had a "trap" compartment for drugs and drug proceeds, to deliver cocaine to a customer. During this timeframe, Masias purchased an Audi for half a kilogram of cocaine. After the exchange, Masias phoned Maldonado to tell him about the Audi and to ask his advice as to whether he made a good exchange. Despite having just purchased the Audi, Masias continued to use the Cadillac and allowed Maldonado to use his Lexus or Audi.

On January 14, 2010, the Defendants coordinated the delivery of two kilograms of cocaine from Gorostieta to a customer. The Defendants argued over how they would divide their cut of the deal. During this argument, Masias told Maldonado to "be a good middleman … That way we don't have no incidents." Before the deal was complete, Maldonado called Rodriguez and suggested he rob Gorostieta of the

money from the two kilograms and an additional kilogram of cocaine the supplier had in his car. However, after intercepting these calls, agents conducted a traffic stop of Gorostieta and seized the cocaine and cash to prevent Maldonado and Rodriguez from committing the robbery. Not knowing about the traffic stop and seizure, Maldonado and Rodriguez made several calls about surveilling the supplier. Rodriguez waited several hours in his car on the street where Maldonado believed Gorostieta lived, until Masias informed him of the arrest.

On January 27, 2010, Maldonado sent Rodriguez to Masias' residence to pick up nine ounces of fronted cocaine. Masias gave Rodriguez a full kilogram that Maldonado and Rodriguez split for further distribution.

On February 1, 2010, Masias informed Maldonado of 16 firearms he bought. Maldonado agreed to help sell them and drove to Masias' to pick them up. Upon arrival, Masias placed a large, weighted bag in Maldonado's car. Maldonado drove to Rodriguez's house and took the bag into his house. Rodriguez was subsequently seen placing a rifle bag in a U-Haul. Based on agents' suspicion from surveillance of Rodriguez placing what appeared to be the guns from Maldonado into the U-Haul, the agents conducted a traffic stop of the truck. Rodriguez consented to a search of the truck where the agents found a loaded rifle.

After Rodriguez's arrest, Maldonado called Denise Aceves, Rodriguez's girlfriend, expressing concern over potential charges against Rodriguez. He also coordinated with her to get the remaining drugs and firearms out of the house.

Maldonado then called Masias to inform him of the arrest. During this call, Masias indicated that he had recently fronted cocaine to Rodriguez. Shortly after Rodriguez's arrest, agents observed Aceves moving a large laundry basket and a shoebox from their apartment into her car. The agents searched this car and found 16 firearms and a half kilogram of cocaine.

Masias was arrested on September 15, 2010. During a search of his residence, agents found a kilo press, used for rerocking, and a bottle of inositol, a cutting agent for cocaine.

At trial, in his opening statement, Maldonado's counsel told the jury that the government intended to prove multiple conspiracies between Maldonado, Masias, and Rodriguez. This, the government contends, led it to propose a multiple conspiracies jury instruction. Over defense objection, the district court gave a modified version, with adjustments suggested by the defense. Masias requested an additional "meeting of the minds" jury instruction regarding the conspiracy. After careful consideration and discussion with both parties, the district court refused this instruction, finding that it was not an accurate statement of the law.

The jury found the Defendants guilty on all counts. Masias moved for a new trial, arguing that the district court erred by giving a multiple conspiracies instruction, and refusing the "meeting of the minds" instruction.

Maldonado moved for acquittal or a new trial, arguing that there was insufficient evidence to prove anything beyond a mere buyer-seller relationship with Masias and Rodriguez, and that the district court erred by giving the multiple conspir-

acies instruction. The district court denied all motions; both defendants timely appealed.

## II. ANALYSIS

### A. Sufficiency of the Evidence for Conspiracy Conviction

The Defendants challenge the sufficiency of the evidence the government used to prove a conspiracy existed between them and Rodriguez. "Any challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable, burden." *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016) (internal quotation marks and citation omitted). Great deference is afforded to jury verdicts, and thus, viewing the evidence in the light most favorable to the government, we "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Brown*, 726 F.3d 993, 1005 (7th Cir. 2013) (quotation marks omitted).

To prove a drug-distribution conspiracy, "the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). To distinguish a buyer-seller agreement from a conspiracy, "the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *Id.* at 755.

"[S]ales of large quantities of drugs, repeated and/or standardized transactions, and a prolonged relationship

between the parties" are inherent characteristics indicative of a conspiracy rather than a buyer-seller relationship. *United States v. Villasenor*, 664 F.3d 673, 680 (7th Cir. 2011) (quoting *Johnson*, 592 F.3d at 754). Other characteristics we have found indicative of establishing a conspiracy include "sales on credit, an agreement to look for customers, commission payments, evidence that one party provided advice for the other's business, or an agreement to warn of future threats to each other's business from competitors or law enforcement." *Id.*

The evidence was sufficient for a reasonable jury to find a conspiracy existed between Masias and Maldonado, rather than a mere buyer-seller relationship. The Defendants correctly assert that, "[r]epeat sales, without more simply do not place the participants' actions into the realm of conspiracy." *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001). However, "[a] reasonable jury can infer a conspiracy from evidence of … multiple, large-quantity purchases, on credit." *United States v. Cruse*, 805 F.3d 795, 811–12 (7th Cir. 2015) (quoting *United States v. Jones*, 763 F.3d 777, 807 (7th Cir. 2014)) (internal quotation marks omitted).

The Defendants concede that they had a prolonged relationship. During this relationship, Masias regularly sold large amounts of cocaine to Maldonado, who subsequently rerocked the cocaine for resale. Additionally, the evidence showed that on numerous occasions Masias fronted large quantities of cocaine to Maldonado.

The evidence also showed that the Defendants occasionally worked cooperatively. One such occasion occurred on January 11, 2010, when Masias negotiated and coordinated a

deal while Maldonado received the delivery. The two agreed to check the quality of the cocaine together. On this same day, Maldonado agreed to buy cutting agent for Masias. Another instance occurred when Maldonado loaned his Cadillac with a "trap" compartment for drugs and drug proceeds to Masias. Maldonado met with Masias to show him how the "trap" compartment worked. Yet another instance occurred on January 14, 2010, when they coordinated a sale of two kilograms of cocaine from Gorostieta. Again, Masias coordinated the deal and Maldonado picked up the cocaine. Both Defendants took a cut from the deal.

The Defendants also argue that the suspicion and lack of trust Maldonado and Rodriguez had towards Masias proves a lack of conspiracy. However, despite this lack of trust and suspicion, Maldonado continued to work closely with Masias in furthering their common objective of distributing cocaine. Thus, we find the government produced sufficient evidence for a reasonable jury to find beyond a reasonable doubt that a conspiracy existed between Masias and Maldonado.

The Defendants also argue that the government failed to prove a conspiracy between Maldonado and Rodriguez. Rather, they argue the relationship was a brother-like relationship. We disagree.

The government provided evidence of Masias fronting cocaine to Rodriguez, who was introduced to Masias through Maldonado. Maldonado provided business advice to Rodriguez by showing him how to rerock cocaine. In fact, the brother-like relationship Maldonado and Rodriguez had could equally be viewed as a mentor-like relationship between

two business people. All of the information relayed from Maldonado to Rodriguez could be identified as business advice. Furthermore, upon Rodriguez's arrest, Maldonado called Aceves to inquire about the arrest and coordinated with her to get the remaining drugs and guns from the house. He also called Masias to inform him of the incident. Similar to *United States v. Nunez*, Maldonado "could simply have cleared out," but he chose to contact Rodriguez's girlfriend, coordinate with her to clear the house, and call Masias to inform him of the incident. 673 F.3d 661, 666 (7th Cir. 2012) (finding defendant's role in warning supplier's family of supplier's arrest indicative of affirming conspiracy conviction). Finally, Rodriguez testified that Maldonado stored cocaine and firearms at Rodriguez's home. *See United States v. Carrillo*, 435 F.3d 767, 776–76 (7th Cir. 2006) (finding that co-conspirator's storage of drugs at defendant's home was indicative of defendant's participation in conspiracy).

We find the government produced sufficient evidence for a reasonable jury to find beyond a reasonable doubt that a conspiracy existed between Maldonado and Rodriguez. Thus, we affirm the conspiracy conviction.

### B. Jury Instructions

The Defendants argue the district court erroneously instructed the jury. Both Defendants argue the jury should not have been instructed on a multiple conspiracies theory. Masias separately argues that the district court erred in declining to instruct the jury on a "meeting on the minds" instruction.

### i. Multiple Conspiracies Instruction

The Defendants argue that the district court gave a multiple conspiracies instruction that did not properly apply to the facts and charges in this case. "We review *de novo* whether an instruction fairly and accurately summarizes the law, and review a district court's decision to give a particular instruction for an abuse of discretion." *United States v. Carter*, 695 F.3d 690, 694 (7th Cir. 2012) (internal citations omitted). The Defendants do not contend that the jury instruction was an inaccurate summary of the law, thus we review the decision to give the instruction for an abuse of discretion. On appeal, we will not disturb jury instructions that are accurate statements of the law and supported by the record. *United States v. Fifer*, 863 F.3d 759, 769 (7th Cir. 2017).

At trial, the government proposed the multiple conspiracies instruction. The district court gave the Seventh Circuit Pattern Instruction 5.10(B) on multiple conspiracies, slightly modified at the Defendants' request. The district court instructed the jury:

> If you find there was one overall conspiracy as alleged in Count One and that a particular defendant was a member of that conspiracy, you should find that defendant guilty of Count One.

> If you find that there was more than one conspiracy and that the defendant was a member of one or more of those conspiracies, then you may find the defendant guilty on Count One only if the conspiracy of which he was a member was a part of the conspiracy charged in Count One.

> If, on the other hand, the proven conspiracy is not included within the conspiracy alleged in Count One, you should find that defendant not guilty of Count One.

The Defendants heavily rely on a "hub and spokes" argument, asserting that this case does not involve a situation where the "spokes" in a conspiracy are connected by an overarching wheel, citing to *United States v. Kotteakos*, 328 U.S. 750, 755 (1946). Thus, they argue, without an overarching wheel connecting these two alleged conspiracies, the two relationships are separate and not made in furtherance of the charged conspiracy. Specifically, the Defendants argue that if the jury failed to find Masias and Rodriguez conspired together, then no conspiracy between the three Defendants could have been found. We disagree.

As the district court noted, the jury could have found Masias and Maldonado conspired together while Maldonado and Rodriguez conspired together. This finding would allow the jury to conclude that the three Defendants "shared a common objective or purpose, the defining characteristic of a conspiracy." *United States v. Campos*, 541 F.3d 735, 742 (7th Cir. 2008) (internal quotation marks and citation omitted).

Maldonado's counsel introduced the idea of multiple conspiracies in his opening statement. This opened the door to a multiple conspiracies theory, thus making the instruction appropriate. *United States v. Mims*, 92 F.3d 461, 467 (7th Cir. 1996) ("A multiple conspiracy instruction is appropriate when the evidence presented at trial could tend to prove the existence of several distinct conspiracies."). We find no reversible

error in the district court's decision to give the multiple conspiracies jury instruction.

### ii. Meeting of the Minds Instruction

Finally, Masias argues separately that the district court erred in refusing to instruct the jury on a "meeting of the minds" instruction he proposed to the district court. We review *de novo* a refusal to give a requested jury instruction. *United States v. Choiniere*, 517 F.3d 967, 970 (7th Cir. 2008). "Although a defendant may have the jury consider any theory of defense that is supported by law and fact, a defendant is not automatically entitled to a particular jury instruction." *Id.* (*citing United States v. James*, 464 F.3d 699, 707 (7th Cir. 2006)). To warrant specific jury instructions, the defendant must demonstrate: "1) the instruction is a correct statement of law, 2) the evidence in the case supports the theory of defense, 3) that theory is not already part of the charge, and 4) a failure to provide the instruction would deny a fair trial." *Id.* (*citing United States v. Fiedeke*, 384 F.3d 407, 410 (7th Cir. 2004)).

Masias proposed the following instruction:

> A conspiratorial agreement can only exist if there is a sincere meeting of the minds between at least two parties. If one party misleads another about his intentions such that there is no common objective or purpose shared between them, then there can be no conspiracy between these parties. If one of the parties mistakenly believes or is led to mistakenly believe that he shares a common illegal purpose or objective with the other, then no conspiracy exists.

Masias argues that the evidence at trial indicated that Maldonado consistently lied to and misled Masias about his intentions and actions and thus, there was no true "meeting of the minds." We disagree.

Deceit or dishonesty amongst the Defendants does not negate their shared common objective of distributing cocaine. *See Campos*, 541 F.3d at 742 (noting that the defining characteristic of a conspiracy is "a common objective or purpose."). Any relationship outside of the Defendants' well-established core agreement to distribute cocaine is irrelevant. Thus, we affirm the district court's refusal to instruct the jury on a "meeting of the minds" instruction.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's findings.